67 F.3d 1348
 27 Bankr.Ct.Dec. 1237, Bankr. L. Rep. P 76,671
 In re Larry Wayne SHERMAN; Karen Lucille Sherman, Debtors.
Jack E. BROWN, Trustee, Appellee,
v.
THIRD NATIONAL BANK, Appellant,
J.D. Sherman; Doris Sherman; Junior D. Sherman; Junior D.
Sherman and Doris M. Sherman Revocable Trust, Defendants.
In re Larry Wayne SHERMAN;
In re Karen Lucille SHERMAN, Debtors.
Jack E. BROWN, Trustee, Appellee,
v.
THIRD NATIONAL BANK, Defendant,
J.D. Sherman; Doris Sherman; Junior D. Sherman; Junior D.
Sherman and Doris M. Sherman Revocable Trust, Appellants.
 Nos. 94-3613 and 94-3615.
 United States Court of Appeals,
Eighth Circuit.
 Submitted April 10, 1995.
Decided Oct. 6, 1995.
Rehearing and Suggestion for
Rehearing En Banc Denied
Nov. 21, 1995.
 
 Thomas Vetter, Jefferson City, MO, argued (Ronald Medin on the brief), for appellant Third National Bank.
 Jerry Venter, Jefferson City, MO, argued for Trust.
 Frank Wendt, Kansas City, MO, argued (Donald Koehler, II, on the brief), for appellee.
 Before MAGILL and HANSEN, Circuit Judges, and GOLDBERG,* Judge.
 MAGILL, Circuit Judge.
 
 
 1
 Third National Bank, J.D. Sherman, Doris M. Sherman, and the Junior D. Sherman and Doris M. Sherman Family Revocable Grantor Trust appeal from the district court's[1] decision affirming the bankruptcy court's[2] decision. The bankruptcy court's decision avoided as fraudulent the transfer, within one year of filing a bankruptcy petition, of twelve properties from Larry and Karen Sherman to J.D. and Doris Sherman and eliminated Third National Bank's liens on the properties. We affirm.
 
 I. BACKGROUND
 
 2
 The following facts are undisputed. In approximately 1978, Larry and Karen Sherman (the debtors) began purchasing residential rental property. By 1988, the debtors had acquired eleven properties. Third National Bank (the Bank) provided financing on each of these properties, which was secured by a separate mortgage on each property. The debtors' primary loan officer at the Bank was Donald Broaddus, Senior Vice-President in charge of the real estate department. He had been the debtors' banker for fifteen years.
 
 
 3
 The debtors fell behind on their payments to the Bank in late 1989. In December 1989 and August 1990, the debtors executed two additional notes secured by a second and third mortgage on some of the eleven properties to secure their unsecured debts to the Bank.
 
 
 4
 In July 1990, the Pettis County Collector published a list of properties for sale due to delinquent real estate taxes. This list included several of the debtors' properties. The Bank paid one year of the debtors' delinquent real estate taxes and added that amount to the mortgage debts, thereby obviating the possibility of a tax sale.
 
 
 5
 After publication of the tax sale list, J.D. Sherman (Larry Sherman's father) contacted Broaddus, who was an old grade school acquaintance, to determine whether Larry was having financial difficulties. Broaddus informed J.D. that the debtors were in the midst of financial troubles. J.D. also contacted Harry Eilert, Jr. of Benson Lumber Company (Benson), and Eilert informed J.D. that Larry was behind in his payments to Benson.
 
 
 6
 In September 1990, Benson filed suit against Larry Sherman in Missouri state court for failure to pay approximately $37,000 for materials Benson supplied to Larry. Prior to this suit, the debtors gave Benson a fraudulent financial statement showing real estate with equity of $210,000 in an attempt to stave off collection of prior debts and receive additional credit.[3]
 
 
 7
 Meanwhile, the Bank planned to start foreclosure proceedings against the debtors' eleven properties on January 4, 1991. However, prior to initiation of foreclosure proceedings, J.D. contacted Broaddus and offered to purchase the eleven properties if the Bank provided financing. J.D.'s motivation for purchasing the eleven properties was to prevent the Bank from foreclosing on his son. The Bank agreed to finance the Shermans' purchase of the eleven properties.
 
 
 8
 On January 22, 1991, J.D. and Doris Sherman (the Shermans) borrowed $246,000 from the Bank to finance the purchase of the eleven properties. Broaddus testified that the Bank typically would only make loans for 70-75% of the value of rental property. J.A. at 207. At this time, the only information available to the parties concerning the value of the eleven properties indicated they were worth approximately $310,750; subsequently, the parties stipulated that the fair market value was only $247,150 at the time of the transfer. Of the proceeds of the Bank's loan to the Shermans, $243,527.90 applied to the purchase of the eleven properties, with $237,602.15 paying off the debtors' thirteen notes held by the Bank and $5,925.75 paying off delinquent real estate taxes; $207 for recording fees; $737 for title insurance; and $822.36 to the Shermans. The debtors deeded the eleven properties to the Shermans; the Shermans executed a promissory note in the amount of $246,000 payable to the Bank secured by a deed of trust encumbering the eleven properties; and the Bank released the debtors' thirteen deeds of trust encumbering the eleven properties. All of the relevant deeds were prepared by the Bank. On January 23, 1991, the warranty deed, the deed of trust and the deed of release were recorded at the county recorder's office. On February 15, 1991, the Shermans transferred the properties to the Junior D. Sherman and Doris M. Sherman Family Revocable Trust (Sherman Trust).
 
 
 9
 In April 1991, J.D. paid a $5000 debt that the debtors owed to Union Savings Bank which was secured by a deed of trust on another property (the Sedalia property). J.D. then applied to the Bank for a $6500 loan and offered the Sedalia property as security; however, the debtors still held title to the Sedalia property. Broaddus prepared a warranty deed transferring the Sedalia property from the debtors to the Shermans. The Bank closed the $6500 loan to J.D. on May 3, 1991, and J.D. gave the Bank a first mortgage on the Sedalia property as security. This property had a stipulated value of $10,500 as of May 3, 1991.
 
 
 10
 The debtors first began to consider filing for bankruptcy in the summer of 1990. On June 27, 1991, the debtors filed a Joint Petition for Relief under Chapter 7 of the Bankruptcy Code. The debtors omitted the Benson litigation and the May 3, 1991 transfer of the Sedalia property to J.D. from their bankruptcy schedules, and misstated the nature of the transfer of the eleven properties on January 22, 1991 as "purchased by JD Sherman from Third National Bank prior to foreclosure sale 12/90."
 
 
 11
 The bankruptcy trustee brought an adversary proceeding before the bankruptcy court, seeking to avoid the transfer of the twelve properties to the Shermans and the Bank's two liens securing the Shermans' mortgages on the twelve properties (the Bank's liens). The bankruptcy court found that the transfers of the properties were avoidable under 11 U.S.C. Sec. 548(a)(1)[4] and that the Shermans did not retain liens on the properties under Sec. 548(c).[5] The court held that the trustee could recover the security interest in the properties from the Bank and the properties from the Sherman Trust under Sec. 550(a)(2). The court also held that neither the Bank nor the Sherman Trust were protected from recovery under Sec. 550(b). Finally, the court held that the May 3, 1991 transfer was an avoidable preference under 11 U.S.C. Sec. 547.
 
 
 12
 The Shermans and the Bank appealed to the district court, which affirmed the decision of the bankruptcy court. This appeal followed.
 
 II. DISCUSSION
 
 13
 The Shermans and the Bank each raise three issues on appeal. The Shermans allege the bankruptcy court and district court erred in: (1) determining the debtors violated Sec. 548(a)(1) by transferring the twelve properties with the actual intent to hinder, delay or defraud creditors; (2) denying the Shermans any liens or interest in the transferred properties under Sec. 548(c) because the Shermans did not act in good faith; and (3) determining that the transfer of property in May 1991 was an avoidable preference. The Bank alleges the bankruptcy court and district court erred in: (1) determining that the Bank's liens could be avoided pursuant to Sec. 550(a)(2); (2) denying the Bank an equitable lien under 11 U.S.C. Sec. 550(b); and (3) determining that recovery of the twelve properties combined with avoidance of the Bank's liens without granting the Bank a replacement lien was not a double recovery prohibited by Sec. 550(c).
 
 
 14
 We use the same standard of review as did the district court. We review the bankruptcy court's legal conclusions de novo and its factual findings for clear error. In re Howell Enters., Inc., 934 F.2d 969, 971 (8th Cir.1991). A finding is clearly erroneous only if we are left with a definite conviction that a mistake has been committed.
 
 A. The Shermans' Claims
 
 15
 1. Avoidance of Fraudulent Transfers Under Sec. 548(a)
 
 
 16
 The bankruptcy court determined that the debtors' transfer of eleven properties to the Shermans in January 1991 and the transfer of the Sedalia property in May 1991 were avoidable under Sec. 548(a)(1) because the debtors acted with the actual intent to hinder, delay or defraud creditors. This finding of actual fraudulent intent by the bankruptcy court is a factual finding that we will reverse only upon a showing of clear error. In re Acequia, Inc., 34 F.3d 800, 805 (9th Cir.1994); McCormick v. Security State Bank, 822 F.2d 806, 808 (8th Cir.1987).
 
 
 17
 Section 548(a)(1) allows the trustee to avoid any transfer of property made by the debtor within one year of filing a bankruptcy petition, if the debtor "made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted." The Shermans concede that the transfers were made within one year of the debtors filing their bankruptcy petition. They argue that the district court erred in determining that the trustee proved by a preponderance of the evidence that the debtors acted with the actual intent to hinder, delay or defraud their creditors.
 
 
 18
 Because proof of actual intent to hinder, delay or defraud creditors may rarely be established by direct evidence, courts infer fraudulent intent from the circumstances surrounding the transfer. Max Sugarman Funeral Home, Inc. v. A.D.B. Investors, 926 F.2d 1248, 1254 (1st Cir.1991); Matter of Fitzpatrick, 73 B.R. 655, 657 (Bankr.W.D.Mo.1985), aff'd in part & rev'd in part by Kidder Skis Int'l v. Williams, 60 B.R. 808 (W.D.Mo.1985). In determining whether the circumstantial evidence establishes fraudulent intent, courts determine whether any "badges of fraud," which existed under the common law, are present in the transfer. See, e.g., In re Kaiser, 722 F.2d 1574, 1582 (2d Cir.1983). The presence of a single badge of fraud is not sufficient to establish actual fraudulent intent; however, "the confluence of several can constitute conclusive evidence of an actual intent to defraud, absent 'significantly clear' evidence of a legitimate supervening purpose." Max Sugarman Funeral Home, Inc., 926 F.2d at 1254-55 (citation omitted).
 
 
 19
 The bankruptcy court used Missouri's codification of the common law badges of fraud to determine whether the debtors acted with actual fraudulent intent. Although the existence of actual fraudulent intent under Sec. 548(a)(1) is a matter of federal law, we believe it was appropriate for the bankruptcy court to utilize Missouri's codification of the common law badges of fraud in its analysis. The badges of fraud that the bankruptcy court considered were whether:
 
 
 20
 (1) The transfer or obligation was to an insider;
 
 
 21
 (2) The debtor retained possession or control of the property transferred after the transfer;
 
 
 22
 (3) The transfer or obligation was disclosed or concealed;
 
 
 23
 (4) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
 
 
 24
 (5) The transfer was of substantially all the debtor's assets;
 
 
 25
 (6) The debtor absconded;
 
 
 26
 (7) The debtor removed or concealed assets;
 
 
 27
 (8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
 
 
 28
 (9) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
 
 
 29
 (10) The transfer occurred shortly before or shortly after a substantial debt was incurred; and
 
 
 30
 (11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.
 
 
 31
 Mo.Rev.Stat. Sec. 428.024(2) (Supp.1995). The bankruptcy court found five badges of fraud, that: (1) the Shermans were insiders; (2) the debtors concealed the transfers; (3) the debtors had been sued prior to the transfers by Benson and several other debts had been reduced to judgment; (4) the transfers were of substantially all of the debtors' assets; and (5) the debtors were insolvent at the time of the transfers. The court found that the Shermans gave full and fair consideration for eleven of the properties, although they gave no consideration for the Sedalia property; found that the debtors relinquished control of the properties; and assumed that no unsecured creditors were actually harmed by the transfers. The court also found that the debtors' trial testimony that they did not understand the nature of the transfers was not credible. The Shermans' attorney conceded this in oral argument. After weighing all of the competing factors, the court found that the debtors acted with actual fraudulent intent.
 
 
 32
 The Shermans argue that the bankruptcy court committed clear error in finding that the debtors concealed the transfers. We disagree. The bankruptcy court found that the debtors omitted the transfer of the Sedalia property from their bankruptcy schedule and misrepresented the transfer of the eleven properties. Furthermore, the bankruptcy court found that the debtors' testimony that they did not understand the nature of these transactions was not credible. That the transfers were recorded as a matter of public record does not absolve the debtors from their duty to truthfully disclose these transactions on their bankruptcy schedules. We find the Shermans' arguments to the contrary to be meritless. Accordingly, the bankruptcy court did not clearly err in determining that the debtors concealed the transfers.
 
 
 33
 The Shermans also argue that the bankruptcy court clearly erred in finding that the transfers were for substantially all of the debtors' assets. However, the Shermans stipulated that the transfer of the eleven properties on January 22, 1991, constituted substantially all of the assets of the debtors. J.A. at 152. The Shermans are bound by this stipulation, and we will not entertain any arguments to the contrary in this appeal.
 
 
 34
 Accordingly, we do not believe that the bankruptcy court clearly erred in finding the presence of five badges of fraud. We believe that the presence of these five badges of fraud, combined with the bankruptcy court's finding that the debtors' testimony was not credible, constitutes conclusive evidence that the debtors acted with the actual intent to hinder, defraud or delay their creditors.[6] Max Sugarman Funeral Home, Inc., 926 F.2d at 1254-55. Thus, we affirm the district court's, and the bankruptcy court's, decision that the trustee may avoid the debtors' transfer of the twelve properties under Sec. 548(a)(1).[7]
 
 
 35
 2. Good Faith Transferee's Lien Under Sec. 548(c)
 
 
 36
 The Shermans argue that the bankruptcy court erred in denying them a Sec. 548(c) lien on the twelve properties subject to the Sec. 548(a) avoidable transfer. The bankruptcy court denied the Shermans' request for this lien, determining that they "did not take the transfers [of the twelve properties] in good faith." We review this finding for clear error.
 
 
 37
 When a transfer is avoided under Sec. 548(a), a transferee who takes for value and in good faith is given a lien to the extent of the value given to the debtor in exchange for the transfer under Sec. 548(c). It is undisputed that the Shermans gave value for the transfer of the twelve properties. The Shermans argue that the bankruptcy court erred in determining that they did not act in good faith with respect to the transfers.
 
 
 38
 The Bankruptcy Code does not define good faith. Good faith is not susceptible of precise definition and is determined on a case-by-case basis. In re Roco Corp., 701 F.2d 978, 984 (1st Cir.1983). To determine whether a transferee acts in good faith, "courts look to what the transferee objectively 'knew or should have known' " instead of examining the transferee's actual knowledge from a subjective standpoint. In re Agricultural Research & Technology Group, Inc., 916 F.2d 528, 535-36 (9th Cir.1990); cf. Bonded Fin. Servs. v. European Am. Bank, 838 F.2d 890, 897-98 (7th Cir.1988) (analyzing good faith under Sec. 550(b)). In other words, a transferee does not act in good faith when he has sufficient knowledge to place him on inquiry notice of the debtor's possible insolvency. In re Anchorage Marina, Inc., 93 B.R. 686, 693 (Bankr.D.N.D.1988); see also 4 Collier, at 548-72 to -73. In a related context to determine whether good faith exists, the court looks to whether "the transaction carries the earmarks of an arms-length bargain." In re Robbins, 91 B.R. 879, 886 (Bankr.W.D.Mo.1988) (internal quotation and citations omitted) (analyzing good faith under Sec. 549(c)).
 
 
 39
 The bankruptcy court found that the Shermans were aware of sufficient facts concerning the debtors' precarious financial situation to place the Shermans on inquiry notice of the debtors' insolvency and looming bankruptcy. Specifically, the bankruptcy court found that the Shermans were aware of the following facts: Karen Sherman's recent illness caused the debtors to incur substantial medical debts; the Shermans knew about the debtors' indebtedness to Benson and Benson's impending lawsuit against the debtors; and the Shermans were aware that the debtors were behind in mortgage payments to the Bank and that the Bank was planning to commence foreclosure proceedings. We agree with the bankruptcy court's conclusion that the combination of these factors places the Shermans on inquiry notice of the debtors' insolvency. Thus, the Shermans did not take the transfer of the twelve properties in good faith. The Shermans have not demonstrated that any of these findings are clearly erroneous. Therefore, we affirm the bankruptcy court's conclusion that the Shermans are not entitled to a lien on the twelve properties under Sec. 548(c).
 
 
 40
 Furthermore, the transfer of the twelve properties did not bear the earmarks of an arms-length transaction. The purchase price of the properties directly corresponded to the amount of indebtedness on the properties, not their fair market values. At the time of the transfer of the eleven properties, the only information available concerning the value of the properties were old appraisals which valued the properties at approximately $310,000. Neither the Shermans nor the debtors had the property appraised to determine its fair market value at the time of the transfer. The Shermans purchased the eleven properties for $246,000, an amount slightly higher than the amount of the debtors' mortgages and delinquent taxes on the properties. The debtors received no consideration for any equity they had in the property. There is no evidence in the record that the purchase price bears any relation to any perceived fair market value. Furthermore, the Shermans did not negotiate the purchase price of the eleven properties with the debtors. The only negotiations concerning the purchase of the eleven properties were conducted between the Shermans and the Bank. J.A. at 299. Accordingly, it is clear that this was not an arms-length transaction. The same observations are doubly true with respect to the transfer of the Sedalia property in May. The debtors transferred the Sedalia property to the Shermans for no consideration. The Shermans did not negotiate the transfer of the Sedalia property with the debtors, nor did they discuss the value of the property. J.A. at 307-08. Prior to the transfer, the Shermans paid a $5000 debt on behalf of the debtors. At the time of the transfer of the Sedalia property, its fair market value was $10,500. Even assuming that the Shermans' $5000 payment constituted consideration for the Sedalia property, the Shermans paid less than one-half the fair market value for the Sedalia property.
 
 
 41
 Thus, the bankruptcy court and the district court correctly determined that the Shermans did not act in good faith when they purchased the twelve properties from the debtors. Accordingly, the Shermans are not entitled to liens under Sec. 548(c).
 
 B. The Bank's Claims
 
 42
 1. Protection From Recovery Under Sec. 550(b)
 
 
 43
 Section 550 determines from whom the trustee may recover property whose transfer has been avoided pursuant to Sec. 548. Section 550(a)[8] allows the trustee to recover property from the initial transferee, or any immediate or mediate transferee of the initial transferee. Section 550(b),[9] however, prevents the trustee from recovering an avoided transfer from an immediate transferee who takes for value, in good faith and without knowledge of the voidability of the transfer avoided. The Bank was an immediate transferee of a security interest from the Shermans. The Bank argues it is entitled to the protection of Sec. 550(b) because it took for value, in good faith and without knowledge of the voidability of the transfers from the debtors to the Shermans. The bankruptcy court determined that the Bank was not entitled to the protection of Sec. 550(b) because it had extensive knowledge of the debtors' deteriorated financial condition and voidability of the transfers.[10]
 
 
 44
 Neither the Bankruptcy Code, nor its legislative history, defines knowledge as used in Sec. 550(b)(1). Smith v. Mixon, 788 F.2d 229, 232 (4th Cir.1986). "No one supposes that 'knowledge of voidability' means complete understanding of the facts and receipt of a lawyer's opinion that such a transfer is voidable; some lesser knowledge will do." Bonded Fin. Servs., 838 F.2d at 898 (citations omitted). However, knowledge is a stronger term than notice, and we do not require a transferee to be a vigilant monitor for the creditors' benefit when he possesses no information suggesting that there is a fraudulent conveyance in the chain. Id. Accordingly, we believe that a transferee has knowledge if he "knew facts that would lead a reasonable person to believe that the property transferred was recoverable." In re Nordic Village, Inc., 915 F.2d 1049, 1055 (6th Cir.1990) (quoting Smith, 788 F.2d at 232 n. 2), rev'd on other grounds sub nom. United States v. Nordic Village, Inc., 503 U.S. 30, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992). In this vein, some facts suggest the underlying presence of other facts. If a transferee possesses knowledge of facts that suggest a transfer may be fraudulent, and further inquiry by the transferee would reveal facts sufficient to alert him that the property is recoverable, he cannot sit on his heels, thereby preventing a finding that he has knowledge. In such a situation, the transferee is held to have knowledge of the voidability of the transfer. In re Agricultural Research & Technology Group, 916 F.2d at 536; Bonded Fin. Servs., 838 F.2d at 898; In re Goodwin, 115 B.R. 674, 677 (Bankr.C.D.Cal.1990).
 
 
 45
 We agree with the bankruptcy court's finding that the Bank had knowledge of the voidability of the transfer. The Bank had knowledge of Karen Sherman's illness and that the debtors had incurred "tremendous medical bills" as a result of this illness. The Bank also knew of the delinquent taxes on the properties. The Bank obviously had knowledge that it was planning to foreclose upon the eleven properties. The Bank knew that the transfer of the eleven properties in January and the Sedalia property in May was to the parents of the debtors. The Bank possessed a financial statement of the debtors and knew that, according to the financial statement, the transfer of the eleven properties constituted substantially all of the assets of the Shermans. J.A. at 152.
 
 
 46
 This information gave the Bank knowledge of the presence of at least three badges of fraud with respect to the transfer of the eleven properties: (1) that the transfers were to an insider; (2) that the transfers were of substantially all of the debtors' assets; and (3) that the transfers rendered the debtors insolvent. As noted above, the presence of three badges of fraud is sufficient to establish fraudulent intent; accordingly, the Bank had knowledge that the transfer was avoidable. This conclusion is reinforced when the Sedalia property is also considered. The Bank prepared documents transferring the Sedalia property from the debtors to the Shermans for no consideration. At the time of the Sedalia transfer, the Bank knew that it had already transferred substantially all of the debtors' assets to the Shermans and that the debtors had incurred "tremendous medical bills."
 
 
 47
 We believe the record clearly supports the bankruptcy court's finding that the Bank had knowledge of the voidability of the transfer. Accordingly, we affirm the bankruptcy court's decision that the Bank could not invoke the protection of Sec. 550(b) to prevent the trustee from avoiding its two liens on the twelve properties.
 
 
 48
 2. Lien for Improvements Under Sec. 550(d)[11]
 
 
 49
 The Bank argues that the bankruptcy court erred by failing to grant it a lien under Sec. 550(d) for the amount of the pre-transfer liens it held on the eleven properties.
 
 
 50
 Section 550(d)[12] provides a lien for a good faith transferee to secure the cost of any improvement made after the transfer by the transferee. Under the plain terms of Sec. 550(d), the Bank is not entitled to a lien for the amount of its pre-transfer liens. Although the Bank's release of these liens may be considered an improvement to the properties, this release occurred prior to the transfer that is subject to avoidance. Section 550(d) only grants liens for improvements that occur after the transfer was made. Thus, the Bank is not entitled to a lien in the amount of its pre-transfer liens under Sec. 550(d) because the release of these liens occurred before, not after, the transfer of the eleven properties from the debtors to the Shermans.
 
 3. Double Recovery Prohibited
 
 51
 Lastly, the Bank argues that the bankruptcy court allowed the trustee a double recovery prohibited by Sec. 550(c)[13] because it allowed the trustee to recover the twelve properties free of any liens, whereas the properties were encumbered when the debtors owned them. The Bank asserts that the trustee's first recovery is the encumbered title from the Shermans and the Sherman Trust. The Bank then postulates that the bankruptcy court's order requiring the Bank to release its mortgages in favor of the Shermans constitutes a second recovery prohibited by Sec. 550(c).[14] We disagree.
 
 
 52
 When the debtors transferred the properties to the Shermans, they transferred all twelve properties unencumbered. This is the transfer that the trustee is seeking to void as fraudulent. When the Shermans received title to the properties, the Shermans then encumbered the properties with notes secured by mortgages in favor of the Bank. We would agree that the trustee received a prohibited double recovery if the Shermans had purchased the properties subject to the mortgages that the debtors had on the properties. However, the trustee is simply recovering the transfer that the debtors made to the Shermans: unencumbered title to all twelve properties. The Shermans are still personally liable to the Bank for the amount of its loans. Additionally, the Shermans have an unsecured claim against the debtors that they may assert in the bankruptcy. See In re Skywalkers, Inc., 49 F.3d 546 (9th Cir.1995) (trustee's recovery of payments made for liquor license and retention of liquor license is not double recovery under Sec. 550(c)).
 
 III. CONCLUSION
 
 53
 For the foregoing reasons, the decision of the district court, affirming the decision of the bankruptcy court, is affirmed.
 
 
 54
 HANSEN, Circuit Judge, dissenting in part.
 
 
 55
 I respectfully dissent only from Part II(B)(3) of the court's opinion and only as to the properties involved in the January 22, 1991, transaction. I do not concur in the view that when the Shermans received the transferred properties, the properties were unencumbered. When the transaction occurred on January 22, 1991, the properties were still encumbered by the debtors' preexisting deeds of trust to the bank. See Jt.App. 186 (ll. 2-7). As far as I can determine from the record, those preexisting deeds of trust were not released of record until all of the papers (including the deed of transfer to the parents) were filed for record the next day. No banker worth his salt would release an existing mortgage until his new mortgage was on file. Thus, at the time of the transfer, the properties were still heavily encumbered.
 
 
 56
 In my view, the trustee receives a double dip when the trustee is allowed both to recover the transferred properties and to avoid the bank's lien, contrary to 11 U.S.C. Sec. 550(c). The bankruptcy estate is placed in a far better position than the heavily mortgaged bankrupts were in before the transfers occurred; it has the properties back free and clear of any encumbrance, all in a case where the bankruptcy court was willing to assume that no unsecured creditor was harmed by the transfers. In my judgment, that adds up to more than the single satisfaction Sec. 550(c) permits the trustee to have and is not equitable. See In Re Skywalkers, Inc., 49 F.3d 546, 549 (9th Cir.1995) ("The avoidance and recovery provisions simply allow a trustee to return a [debtor] to its condition before the preferential transfers.")
 
 
 57
 Because I can find nothing in the bankruptcy court's memorandum opinion or in the district court's affirming opinion discussing the applicability of Sec. 550(c) in this case, I would remand this issue to the district court for remand to the bankruptcy court for further consideration.
 
 
 
 *
 THE HONORABLE RICHARD W. GOLDBERG, Judge, United States Court of International Trade, sitting by designation
 
 
 [1]
 The Honorable Scott O. Wright, Senior Judge, United States District Court for the Western District of Missouri
 
 
 [2]
 The Honorable Frank W. Koger, Chief Judge, United States Bankruptcy Court for the Western District of Missouri
 
 
 [3]
 Benson is the largest unsecured creditor in the debtors' bankruptcy
 
 
 [4]
 Unless otherwise indicated, all statutory references are to Title 11 of the United States Code (1988)
 
 
 [5]
 When a transfer of property is avoided under Sec. 548, subsection (c) provides a good faith transferee a lien against the recovered property to the extent of the value the transferee paid for the transfer
 
 
 [6]
 The Shermans also argue that the transfers cannot be avoided as fraudulent because no creditor was harmed. However, the bankruptcy court correctly noted that under Sec. 548(a)(1), actual harm is not required; the trustee must show only that the debtor acted with the intent to hinder, delay or defraud creditors. "While ordinarily there is no reason for a trustee to seek, or a court to exercise its power, to avoid a transfer which has not harmed anyone, it is to be emphasized that fraud may be committed under section 548(a)(1) even though a fairly equivalent consideration may pass to the transferor and even though creditors are merely hindered or delayed." 4 Collier on Bankruptcy, p 548.02, 548-38 (15th ed. 1995). Furthermore, at the time of the transfers, the only information available indicated that there was substantial equity in the eleven properties and the Sedalia property
 
 
 [7]
 Because we affirm the bankruptcy court's decision that the transfer of all twelve properties, including the Sedalia property, is avoidable under Sec. 548(a), we do not reach its alternative holding that the transfer of the Sedalia property is an avoidable preference under Sec. 547
 
 
 [8]
 Section 550(a) provides:
 Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from--
 (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
 (2) any immediate or mediate transferee of such initial transferee.
 
 
 [9]
 Section 550(b) provides:
 The trustee may not recover under section (a)(2) of this section from--
 (1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or
 (2) any immediate or mediate good faith transferee of such transferee.
 
 
 [10]
 The bankruptcy court also determined that the Sherman Trust was not entitled to the protection of Sec. 550(b). We do not address this holding, as the Sherman Trust has not appealed this issue
 
 
 [11]
 This reference is to 11 U.S.C. Sec. 550(d) (1988). Section 550 was amended in 1994, but those amendments are not applicable to this case
 
 
 [12]
 Section 550(d)(1) provides:
 A good faith transferee from whom the trustee may recover under subsection (a) of this section has a lien on the property recovered to secure the lesser of--
 (A) the cost, to such transferee, of any improvement made after the transfer, less the amount of any profit realized by or accruing to such transferee from such property; and
 (B) any increase in the value of such property as a result of such improvement, of the property transferred.
 
 
 [13]
 This reference is to 11 U.S.C. Sec. 550(c) (1988). Section 550 was amended in 1994, but those amendments are not applicable to this case
 
 
 [14]
 Section 550(c) provides: "The trustee is entitled to only a single satisfaction under subsection (a) of this section."