IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 99-11401
_____


IN THE MATTER OF SOUTHMARK CORPORATION,

                                              Debtor

SOUTHMARK CORPORATION,

                                              Appellee

        v.

SCHULTE ROTH & ZABEL,

                                              Appellant

_____

Appeal from the United States District Court
for the Northern District of Texas
(3:97-CV-2332-L)
_____

November 7, 2000

Before KING, Chief Judge, and REYNALDO G. GARZA and PARKER,

Circuit Judges.

PER CURIAM:[*]

    Appellant Schulte Roth & Zabel ("Schulte") appeals the

district court's judgment finding Schulte liable for $1 million

_____

    [*] Pursuant to 5TH CIR. R. 47.5, the court has determined
that this opinion should not be published and is not precedent
except under the limited circumstances set forth in 5TH CIR. R.
47.5.4.

of a $3.3 million preferential transfer from Appellee Southmark Corporation ("Southmark") to the Parks Group. For the following reasons, we AFFIRM in part and REVERSE in part.

## I. FACTUAL AND PROCEDURAL HISTORY

At the center of this case is a Settlement Agreement by which two entities resolved a proxy fight and several lawsuits. In March 1989, the Parks Group, consisting of R&P Ventures ("R&P"), Garson L. Rice, Sr., Herbert B. Parks, and Byron Investments ("Byron"), disclosed to the Securities and Exchange Commission its intention to propose nominees for election to Southmark's board of directors. On April 20, 1989, the Parks Group publicly disclosed its plan to wage a proxy contest for control of Southmark. Several lawsuits between the parties were commenced around this time.

On May 24, 1989, the Parks Group and Southmark reached a settlement of both the proxy contest and the lawsuits and executed the Settlement Agreement. The Settlement Agreement provided, inter alia, that (1) the proxy contest would be terminated; (2) minority shareholders, including the Parks Group, would have a voice on the Southmark board of directors; (3) three Parks Group nominees would be appointed to the Southmark board of directors; (4) the Parks Group would not engage in further proxy solicitation against Southmark; and (5) the lawsuits would be settled. Moreover, the Settlement Agreement provided for the

2

reimbursement of all of the Parks Group's expenses, including attorney's fees, that had been incurred with respect to the proxy contest and the lawsuits. This reimbursement totaled $3.3 million, $1 million of which was earmarked for legal expenses. From the time of the proxy contest to the execution of the Settlement Agreement, the law firm of Schulte Roth & Zabel was the Parks Group legal representative.

Also on May 24, and roughly four hours prior to the Settlement Agreement's execution, Southmark transferred $3.3 million to Schulte's Citibank account by wire, where it was held in escrow until the following morning. On May 25, the entire $3.3 million was transferred by Citibank, at the request of Schulte, to R&P. R&P then transferred $1 million to Byron, who, in turn, issued a check payable to Schulte for $1 million for the legal services it had rendered.

On July 14, 1989, Southmark filed a petition in Chapter 11 bankruptcy. Southmark then filed a complaint on June 19, 1991, seeking to avoid the $3.3 million transfer to the Parks Group as preferential under 11 U.S.C. § 547(b) and also sought recovery from Schulte of the $1 million it received in legal fees. On April 5, 1993, the bankruptcy court granted summary judgment in favor of Schulte. However, in an opinion dated July 2, 1996, a panel of this court, while recognizing that the case "presents a rare if not unique fact situation," held that the $3.3 million transfer from Southmark to R&P was "for or on account of an

antecedent debt owed by [Southmark] before such transfer was made," declared it an avoidable preference under 11 U.S.C. § 547(b), and remanded the case to the bankruptcy court.  See Southmark Corp. v. Schulte Roth & Zabel (In re Southmark Corp.), 88 F.3d 311, 318 (5th Cir. 1996).

Upon remand, the bankruptcy court, in its March 24, 1997 Memorandum Opinion, granted partial summary judgment in favor of Southmark, finding that Schulte could not avail itself of the preference defense contained in 11 U.S.C. § 547(c)--that the $3.3 million transfer was a "contemporaneous exchange for new value." However, in its August 13, 1997 Memorandum Opinion, the bankruptcy court found that Schulte was not liable to Southmark as a subsequent transferee under 11 U.S.C. § 550(a) because according to the "date of delivery" rule, Schulte had not actually received any funds from the $3.3 million transfer.  The bankruptcy court also held that had Schulte been liable as a subsequent transferee, it would have been unable to rely upon the defense contained in 11 U.S.C. § 550(b)(1)--that it took for value, in good faith, and without knowledge of the voidability of the transfer.  Finally, the bankruptcy court found that if Southmark had succeeded in recovering the $1 million transfer from Schulte, Schulte could assert a claim under 11 U.S.C. § 502(h) as an intended beneficiary of the Settlement Agreement and could also have a claim under the doctrine of subrogation.

4

In a November 17, 1999 opinion, the district court reversed the bankruptcy court's determination that Schulte was not liable under § 550(a) as a subsequent transferee. Moreover, the district court affirmed the bankruptcy court's determination that Schulte could not avail itself of the § 550(b) defense. The district court determined, however, that even though Schulte was required to return the $1 million to Southmark, it was unable to assert a claim under § 502(h).

Schulte timely appealed the district court's judgment.

## II. STANDARD OF REVIEW

When a decision by a bankruptcy court has been appealed to, and reviewed by, a district court, and the case is then appealed to us, we perform the same appellate review as the district court. See Traina v. Sewell (In re Sewell), 180 F.3d 707, 710 (5th Cir. 1999). Therefore, this court reviews a bankruptcy court's findings of fact for clear error and its conclusions of law de novo. See id.; Young v. Nat'l Union Fire Ins. Co. (In re Young), 995 F.2d 547, 548 (5th Cir. 1993); see also FED. R. BANKR. P. 8013. Under the clearly erroneous standard of review, the bankruptcy court's findings will be reversed only if, considering all of the evidence, "we are left with the definite and firm conviction that a mistake has been made." Young, 995 F.2d at 548. Finally, this court reviews a bankruptcy court's grant of

5

summary judgment de novo.  See Century Indem. Co. v. Nat'l Gypsum Co. Settlement Trust (In re Nat'l Gypsum Co.), 208 F.3d 498, 503 (5th Cir.), cert. denied, --- S. Ct. ----, 2000 WL 943857 (2000).

**III. THE $3.3 MILLION TRANSFER WAS**

**NOT FOR "NEW VALUE"**

As a preliminary matter, we believe that the prior panel's decision in this case, that the $3.3 million transfer from Southmark to the Parks Group was an avoidable preference, drives the outcome of the instant appeal, even though it may not technically control it.  We therefore set aside our own views about a proper outcome.  First, we must determine whether Schulte may avail itself of the preference defense contained in § 547(c)(1), which prevents a preferential transfer from being avoided if the transfer was intended as, and in fact was, a "contemporaneous exchange for new value given to the debtor."  11 U.S.C. § 547(c)(1).

The bankruptcy court found that Schulte did not establish the affirmative defense that the $3.3 million was a contemporaneous exchange for new value because the execution of the Settlement Agreement did not result in "new value" for Southmark.  The district court found that this conclusion was not clearly erroneous.

To defend itself under § 547(c)(1), Schulte must demonstrate "intent, contemporaneousness and new value."  Tyler

v. Swiss Am. Sec. (In re Lewellyn & Co.), 929 F.2d 424, 427 (8th Cir. 1991); Cimmaron Oil Co. v. Cameron Consultants, Inc., 71 B.R. 1005, 1008 (Bankr. N.D. Tex. 1987).  Whether intent, contemporaneousness, and new value exist are questions of fact. See Tyler, 929 F.2d at 427; Creditors' Comm. v. Spada (In re Spada), 903 F.2d 971, 975 (3d Cir. 1990).  However, because the question of new value was decided on summary judgment, the bankruptcy court's decision must be reviewed de novo.  See Nat'l Gypsum Co., 208 F.3d at 503.

> Section 547(a) defines "new value" as
>
> money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, including proceeds of such property, but does not include an obligation substituted for an existing obligation[.]

11 U.S.C. § 547(a)(2).  This definition of new value is exclusive.  See Energy Coop., Inc. v. SOCAP Int'l, Ltd. (In re Energy Coop., Inc.), 832 F.2d 997, 1003 (7th Cir. 1987); Cimmaron Oil Co., 71 B.R. at 1009 ("Congress could have allowed courts to expand upon the doctrine of new value by legislating that new value includes certain transactions.  Instead, Congress stated what new value means, which should retard case law expansion.").  Furthermore, because the avoidable transfer is set off only to the extent that new value is given, the creditor is required to demonstrate the "specific measure" of the new value received by

7

the debtor.  See In re Spada, 903 F.2d at 976-77; Jet Fla. Sys., Inc. v. Am. Airlines, Inc. (In re Jet Fla. Sys., Inc.), 861 F.2d 1555, 1558 (11th Cir. 1988).

Schulte argues that by executing the Settlement Agreement, the Parks Group furnished "new value" to Southmark in the form of the termination of the proxy contest and the pending litigation, support for Southmark's board of director nominees, and an agreement to refrain from nominating additional Parks Group representatives.  Based upon our review of the above authority, however, we find that the bankruptcy court was correct in concluding that no new value was exchanged for the $3.3 million. The alleged "value" transferred to Southmark does not rise to the level of "goods, services, or new credit" as required by the exclusive definition of "new value."  There is no evidence in the record that these acts added tangible value to the bankruptcy estate so as to further the policy underlying this defense.[1] Instead, these were, at most, intangible benefits that did not enhance the worth of Southmark's estate in real terms "'so as to offset the reduction in the estate that the transfer caused.'" Miller v. Bodek & Rhodes, Inc. (In re Adelphia Automatic

---

[1]  The defense under § 547(c)(1) "'is grounded in the principle that the transfer of new value to the debtor will offset the payments, and the debtor's estate will not be depleted to the detriment of other creditors.'" Gulf Oil Corp. v. Fuel Oil Supply & Terminaling, Inc. (In re Fuel Oil Supply & Terminaling, Inc.), 837 F.2d 224, 228 (5th Cir. 1988) (quoting A.I. Credit Corp. v. Drabkin (In re Auto-Train Corp.), 49 B.R. 605, 612 (Bankr. D.C. 1985).

Sprinkler Co.), 184 B.R. 224, 228 (Bankr. E.D. Pa. 1995) (quoting In re Aero-Fastener, Inc., 177 B.R. 120, 138 (Bankr. D. Mass. 1994)). Furthermore, Schulte has failed to provide a specific measure of the value Southmark allegedly received.[2] Accordingly, we uphold the district court's decision affirming the bankruptcy court's grant of partial summary judgment in favor of Southmark.

## IV. SCHULTE WAS A SUBSEQUENT TRANSFEREE

## LIABLE UNDER § 550(a)

Section 550(a) of the Bankruptcy Code provides that to the extent a transfer is avoided, a trustee may recover the property transferred, or if the court so orders, the value of such property, from the initial transferee or any subsequent transferee. See 11 U.S.C. § 550(a)(1), (2). Moreover, § 550(b)(1) provides that a subsequent transferee of a preferential transfer cannot be liable to the debtor's estate for the return of such transfer to the extent the transferee took for value, in good faith, and without knowledge of the voidability of the transfer. See id. § 550(b)(1). In this case, we find that the district court was correct in concluding that Schulte was a

---

[2] Schulte contends that the minutes of an October 5, 1989 Southmark board meeting establish that "[t]o Southmark, damages for [an alleged breach] of the Settlement Agreement [by the Parks Group] were valued at in excess of $3.3 million." We conclude that this evidence falls far short of demonstrating a specific measure of value. The subjective opinion of value to the debtor does not satisfy the requirement that Schulte introduce specific evidence that Southmark received $3.3 million in "goods, services, or new credit."

subsequent transferee of a portion of the $3.3 million transfer between Southmark and the Parks Group.  We also agree with the district court that the bankruptcy court did not clearly err in concluding that Schulte had sufficient knowledge of the voidability of the $3.3 million transfer so as to lose the protection of the § 550(b)(1) defense to liability.

### A. Subsequent Transferee Liability Under § 550(a)

The district court declined to apply the "date of delivery" rule employed by the bankruptcy court in its determination of whether Schulte was a subsequent transferee of a portion of the $3.3 million transfer.  Instead, the district court chose to apply the "date of honor" rule and to consider the several interbank transfers as a whole to find that Schulte was a subsequent transferee.

The Bankruptcy Code does not define "transferee."  See Bonded Fin. Servs. Inc. v. European Am. Bank, 838 F.2d 890, 893 (7th Cir. 1988); see also Danning v. Miller (Bullion Reserve of N. Am.), 922 F.2d 544, 548 (9th Cir. 1991).  However, in determining whether a person or entity is a subsequent transferee under bankruptcy law, we agree with the district court that the alleged "transferee" must have had dominion and control over the funds in question.  Cf. Sec. First Nat'l Bank v. Brunson (In re Coutee), 984 F.2d 138, 140 (5th Cir. 1993) (adopting the dominion-and-control test to determine whether a party was an initial transferee for purposes of § 550(b)(1)).  In making this

10

determination, courts are required to "'step back and evaluate a transaction in its entirety to make sure that their conclusions are logical and equitable.'" Danning, 922 F.2d at 549 (quoting Nordberg v. Societe Generale (In re Chase & Sanborn Corp.), 848 F.2d 1196, 1199 (11th Cir. 1988)); see also In re Smith, 966 F.2d 1527, 1532 (7th Cir. 1992) ("We think that some answers to these difficult questions may lie in considering the economic substance of the transaction at issue.").

Schulte contends that Southmark failed to demonstrate that the $1 million that Schulte received from Byron in payment of its legal fees could be traced to the $3.3 million as was required. On May 30, 1989, Schulte's bank, Citibank, presented Schulte's $1 million check from Byron to Byron's bank, Branch Bank and Trust (BB&T). That same day, BB&T presented R&P's check to R&P's bank, First Union. Schulte insists that the district court erred by failing to determine which check cleared first and that Southmark failed in its burden of proof to trace the funds in question to establish Schulte's subsequent transferee status. To do this, Schulte wishes this court to ascertain the precise moment the checks were honored in order to determine which entity is the subsequent transferee of the funds. Schulte argues that because Byron's account was overdrawn when BB&T honored the Schulte check, it was BB&T's funds, not Southmark's, that were used to honor the check. Therefore, Schulte contends that it was

11

possible that Southmark's money was expended to repay BB&T, not Schulte, thus placing BB&T in the subsequent transferee position.

We find that our task here is to "'look beyond the particular transfers in question to the entire circumstance of the transactions.'" Nordberg, 848 F.2d at 1199 (quoting In re Chase & Sanborn Corp.), 813 F.2d 1177, 1181-82 (11th Cir. 1987). The stipulated facts establish that Schulte received the $1 million check from Byron on May 26 and deposited it into its Citibank account on that same day. Two substantial deposits were placed in Byron's BB&T account during the period from May 26 to 29--one deposit was the R&P check for $1 million, and the other was a second R&P check for $975,000. The bankruptcy court found that there were no other substantial deposits made to Byron's BB&T account between May 26 and 30. We agree with the district court that the only funds credited to Byron's BB&T account were those from R&P, which came from Southmark. Moreover, we agree that Byron intended to pay Schulte's legal fees out of the funds it received from R&P. Accordingly, the district court correctly decided that Schulte was a subsequent transferee for the purpose of § 550(a) liability.

### B. Both Courts Correctly Determined that Schulte Had
### Knowledge of the Voidability of the
### $3.3 Million Transfer When It Received Payment

A subsequent transferee of an avoided transfer may defend itself against § 550(a) liability if it demonstrates that it took

12

the transfer for value, in good faith, and without knowledge of the voidability of the transfer avoided.  See 11 U.S.C. § 550(b)(1).  "Knowledge" means that "'the transferee knew facts that would lead a reasonable person to believe that the property [transferred] was recoverable.'"  CCEC Asset Mgmt. Corp. v. Chemical Bank (In re Consol. Capital Equities Corp.), 175 B.R. 629, 638 (Bankr. N.D. Tex. 1994) (alteration in original) (quoting 4 COLLIER ON BANKRUPTCY ¶ 550.03, at 550-17 (15th ed. 1992)).  The bankruptcy court found that, although the "facts present a close question," Schulte "knew facts that would lead a reasonable person to believe that the $3,000,000 transfer to the Parks Group was recoverable"; therefore, Schulte did not take "without knowledge."  The district court concluded that this finding was not clearly erroneous.  We agree.

Whether a defendant had knowledge of the voidability of a transfer is a question of fact.  See Leonard v. Mountainwest Fin. Corp. (In re Whaley), 229 B.R. 767, 776 (Bankr. D. Minn. 1999) (citing Brown v. Third Nat'l Bank (In re Sherman), 67 F.3d 1348, 1357 (8th Cir. 1995)).  The record is replete with evidence indicating knowledge on the part of Schulte that Southmark was on the brink of bankruptcy.  Although Schulte argues that the Settlement Agreement between the Parks Group and Southmark placed Southmark on the "road to financial recovery," this is not enough to offset the additional evidence in the record establishing that Schulte had "reasonable cause to believe that a petition may be

13

filed." <u>Grove Peacock Plaza, Ltd. v. Resolution Trust Corp. (In re Grove Peacock Plaza, Ltd.)</u>, 142 B.R. 506, 520 (Bankr. S.D. Fla. 1992) (quoting 4 COLLIER ON BANKRUPTCY ¶ 550.03, at 550-10).

In the early days of May 1989, Schulte knew that Southmark had issued a March 31, 1989 10-Q report showing that Southmark was insolvent by $428 million. Moreover, media reports existed prior to May 1989 discussing the potential for a Southmark bankruptcy filing. We conclude that these and other findings by the bankruptcy court were sufficient to support its decision that Schulte had knowledge of the impending bankruptcy of Southmark. Therefore, the district court was correct in finding that the bankruptcy court did not clearly err in holding that Schulte could not avail itself of the defense contained in § 550(b)(1).

### V. SCHULTE MAY ASSERT A CLAIM UNDER § 502(h)

Section 502(h) provides:

> A claim arising from the recovery of property under section 522, 550, or 553 of this title shall be determined, and shall be allowed under subsection (a), (b), or (c) of this section, or disallowed under subsection (d) or (e) of this section, the same as if such claim had arisen before the date of the filing of the petition.

11 U.S.C. § 502(h). The bankruptcy court found that it was "axiomatic" that Schulte had a claim against Southmark's estate. Having a claim, however, does not of itself entitle Schulte to share in the distribution of the assets of Southmark's estate; the claim must also be <u>allowed</u>. If the debtor objects to the

14

claim, such claim is "allowable" only to the extent that it is enforceable against the debtor.  See id. § 502(b)(1).

Southmark argues that Schulte does not have an enforceable claim against the estate.  Schulte contends that it was a third-party beneficiary to the Settlement Agreement.  Moreover, Schulte asserts that it may "stand in the shoes" of the Parks Group and recover under equitable subrogation.  Under the theories of intended beneficiary and equitable subrogation,[3] the bankruptcy court found that Schulte had an independent claim against the Southmark estate.  The district court reversed.

State law is applied to determine what claims are valid under § 502.  See Vanston Bondholders Protective Comm. v. Green, 329 U.S. 156, 161 (1946); Kellogg v. United States (In re W. Tex. Mktg. Corp.), 54 F.3d 1194, 1196 (5th Cir. 1995).  The Settlement Agreement is governed by and construed according to New York state law.  After our review of New York state law and the relevant evidence, we agree with the bankruptcy court's determination that Schulte was an intended beneficiary of the Settlement Agreement.

Although a person is not a party to a contract, he or she may sue for breach of that contract if he or she is an intended beneficiary.  Under New York state law, a third party may assert

_____

[3] We need not address whether Schulte has an independent claim against Southmark under the doctrine of equitable subrogation because our examination of whether Schulte was an intended beneficiary is the dispositive inquiry.

15

a claim as an intended beneficiary if "(1) 'no one other than the third party can recover if the promisor breaches the contract' or (2) 'the language of the contract otherwise clearly evidences an intent to permit enforcement by the third party.'" Piccoli A/S v. Calvin Klein Jeanswear Co., 19 F. Supp. 2d 157, 162 (S.D.N.Y. 1998) (quoting Fourth Ocean Putnam Corp. v. Interstate Wrecking Co., 485 N.E.2d 208, 212 (N.Y. 1985)). Regarding the second alternative, the third party need not be mentioned by name in the agreement; however, the intent to benefit that party must be shown on the face of the agreement. See id.; Cauff, Lippman & Co. v. Apogee Fin. Group, Inc., 807 F. Supp. 1007, 1020 (S.D.N.Y. 1992) ("[T]he parties' intention to benefit the third party must be gleaned from the face of the contract[.]"). We agree with the bankruptcy court that the parties to the Settlement Agreement intended to benefit Schulte when executing the Agreement.

Schulte was specifically mentioned by name as the escrow agent for the $3.3 million transfer. In addition, the bankruptcy court found it was undisputed that Southmark was aware that Schulte was the Parks Group's legal counsel. Furthermore, the Settlement Agreement stated that a portion of the $3.3 million was to go to the payment of legal fees. Therefore, we agree that this is sufficient evidence to provide Schulte with an allowable claim against Southmark's estate as an intended beneficiary. Cf. Cauff, Lippman, 807 F. Supp. at 1020 ("New York courts have held that where a broker is expressly identified in a contract which

16

references an obligation to pay a broker its commission, the broker is entitled to recover as a third party beneficiary.").

Accordingly, we conclude that the bankruptcy court was correct in finding that Schulte has an enforceable claim against Southmark's bankruptcy estate as an intended beneficiary of the Settlement Agreement.  We reverse the district court on this issue.

## VI. CONCLUSION

For the foregoing reasons, the district court's decision is AFFIRMED in part and REVERSED in part, and the case is REMANDED to the district court and thence to the bankruptcy court for a determination of the exact amount of the allowable claim to offset the recovery to Southmark.  Each party shall bear its own costs.

17