[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
09/15/98
THOMAS K. KAHN
CLERK

_____

No. 96-6845

_____

D. C. Docket Nos. CV-95-AR-329-W,
94-70883, 94-70537-BKC

IN RE: XYZ OPTIONS, INC.,

Debtor.

DONALD DIONNE, as Trustee of the
Estate of XYZ Options, Inc.,

Plaintiff-Appellant,

versus

W. LEO KEATING,

Defendant-Appellee.

_____

No. 96-6846

_____

D. C. Docket Nos. CV-95-AR-329-W,
94-70883; 94-70537-BKC

IN RE: XYZ OPTIONS, INC.

Debtor.

DONALD DIONNE, as Trustee of the Estate
of XYZ Options, Inc.,

versus

SCOTT M. SPANGLER, JEAN G. SPANGLER,
THE SCOTT M. SPANGLER CHARITABLE TRUST,

Defendants-Appellees.

_____

Appeals from the United States District Court
for the Northern District of Alabama
_____

(September 15, 1998)

Before ANDERSON and BLACK, Circuit Judges, and MOORE*, Senior U.S. District
Judge.

ANDERSON, Circuit Judge:

_____
* The Honorable John H. Moore, II, Senior United States District Judge for the Middle
District of Florida, sitting by designation.

We must determine in this appeal whether a bankruptcy court can look behind a prior consent judgment and whether there are genuine issues of material fact with respect to actual or constructive fraud against creditors. Plaintiff-Appellant Donald Dionne ("Trustee") is the trustee for the bankruptcy estate of XYZ Options, Inc. ("XYZ"). The Trustee sued Defendants-Appellees, Scott M. Spangler, Jean G. Spangler, and the Scott M. Spangler Charitable Remainder Unitrust ("Spangler entities"),[1] asserting fraudulent transfer and preference claims under 11 U.S.C. §§ 547 and 548.[2] The United States District Court for the Northern District of Alabama removed the case from the Bankruptcy Court pursuant to 28 U.S.C. § 157(d).

The Spanglers filed a Motion for Partial Summary Judgment. Defendant W. Leo Keating ("Keating") also filed a Motion for Summary Judgment. In separate orders, the district court granted summary judgment in part in favor of the Spangler entities and Keating. The district court entered final judgment pursuant to Fed. R. Civ. P. 54(b). The Trustee filed a timely Notice of Appeal as to both orders of summary judgment.

## I. **THE RELEVANT FACTS AND COURSE OF PROCEEDINGS**[3]

---

[1] See infra n.5, noting that our use of the name, the Spangler entities, also sometimes includes First Phoenix Capital, a corporation controlled by Scott Spangler.

[2] Although Defendant-Appellee W. Leo Keating was not named in the initial complaint of April 28, 1994, he was named as a defendant in a later amended and restated complaint.

[3] In the summary judgment posture of this case, we state the facts with reasonable inferences drawn in favor of Appellant.

3

The Debtor, XYZ, was owned by William Muscarella and Richard Kendrick.[4] In 1988, XYZ entered into a contract with Machinery Trade Company ("Machinery Trade"), whereby XYZ agreed to build a plant in Iraq to manufacture carbide cutting tools. The total amount of the contract price was approximately $14,000,000. In order to secure payment and XYZ's performance, the contract required both Machinery Trade and XYZ to post letters of credit in favor of each other. The contract required Machinery Trade to pay a down payment of approximately $1,400,000 and post a letter of credit in an amount equal to the amount due XYZ under the contract. The contract also required that XYZ post two letters of credit: one letter as a performance bond for approximately $400,000 and another letter of approximately $1,400,000 to ensure that Machinery Trade could recover the down payment in the event of a default by XYZ.

Muscarella and Kendrick, however, were unable to come up with the required letters of credit because of insufficient assets. They wanted to use the down payment due them from Machinery Trade as collateral, but they could not do so because the letters of credit were a prerequisite to their receipt of this money. In search of financial assistance, XYZ approached Scott M. Spangler, the principal of First Phoenix Capital ("First Phoenix"), for help.[5] First Phoenix and XYZ reached an agreement ("joint agreement")

---

[4] In July of 1993, Richard Kendrick died and his wife was named executrix of his estate. Before the major transfers involved in this case, his interest in XYZ was conveyed to Muscarella.

[5] Because Scott Spangler controlled First Phoenix during the relevant times, we include First Phoenix in our reference in the opinion to the Spangler entities.

whereby First Phoenix agreed to arrange financing for the two letters of credit and lend XYZ $400,000 in working capital for the project. XYZ agreed to repay First Phoenix for any draws made on the letters of credit and signed a note for the amount of the letters of credit plus the working capital loan. The joint agreement also provided that XYZ would use funds received from the Machinery Trade contract to collateralize the letters of credit and eventually remove First Phoenix from the deal. In addition, the transaction provided a base fee of $400,000, payable to First Phoenix, which could increase or decrease depending upon how quickly XYZ could collateralize the letters of credit issued in favor of Machinery Trade.

Machinery Trade caused the issuance of its letter of credit which was confirmed by Banco Nazionale del Lavoro ("BNL"). First Phoenix obtained both of its letters of credit through Northern Trust Bank of Arizona ("Northern Trust"), with Bank of America International as the originating bank. These two letters of credit in favor of Machinery Trade were posted to Rafidain Bank in Iraq. Spangler signed two promissory notes in order to secure the two Northern Trust letters of credit.

Pursuant to the joint agreement with First Phoenix, a closing was held in Texas in October 1988. To secure payment of its note to First Phoenix, XYZ executed an assignment which assigned to First Phoenix the proceeds of the BNL letter of credit. Muscarella brought the BNL letter of credit to this meeting in Texas. While Muscarella laid the letter of credit down on the table, Spangler did not take physical possession of it. Apparently, it was the understanding of the parties that XYZ would retain possession of

5

the BNL letter of credit in order to make credit arrangements with suppliers and shippers.[6]

In November 1988, following the issuance of the required letters of credit, Machinery Trade paid to XYZ the down payment of approximately $1,400,000. After the down payment money was deposited into the joint account of First Phoenix and XYZ, Spangler directed Northern Trust to remove $1,000,000 from the joint account to open a certificate of deposit in the names of First Phoenix and XYZ. First Phoenix then released the remaining $400,000 from the down payment for XYZ's use as working capital.

Three months after receipt of the down payment, Spangler sought a release of the personal assets he had pledged to Northern Trust to secure the two letters of credit in favor of Machinery Trade. In order to do this, First Phoenix and XYZ executed a Third Party Security Agreement granting Northern Trust a security interest in the $1,000,000 certificate of deposit. In addition, XYZ signed a Loan Agreement providing that Northern Trust would first liquidate the $1,000,000 certificate of deposit to satisfy any liability under the letters of credit before turning to Spangler. As a result, Northern Trust released its security interest in Spangler's personal assets.

Performance on the construction project began in early 1989, and Machinery Trade made regular progress payments through the BNL letter of credit. Pursuant to the contract, XYZ would submit a draw to BNL requesting payment for work performed or

---

[6] The question of when and whether First Phoenix held a security interest in the BNL letter of credit is the subject of a companion case, No. 96-7035. The opinion in that case is published simultaneously with this opinion. In November 1993, First Phoenix took possession of the letter of credit and perfected a security interest in the letter of credit.

materials shipped to Iraq. BNL would fund the draw directly to the joint account of First Phoenix and XYZ at Northern Trust.

In the fall of 1989, Spangler discovered that Muscarella, through a business entity named TRU-MET, had acquired ownership of Carbitech, a subcontractor on the Iraqi contract, using money XYZ received from the contract with Machinery Trade. As part of the venture, Muscarella caused XYZ to guarantee TRU-MET's payment of the purchase price. Contending that this activity violated the terms of the joint agreement, Spangler had his attorney draft a Waiver & Assignment, which Muscarella and Kendrick signed. Pursuant to the Waiver & Agreement, First Phoenix agreed to waive the breach, and XYZ agreed to assign and transfer a certain interest in the $1,000,000 certificate of deposit to First Phoenix. The Waiver & Agreement gave First Phoenix permission to use the proceeds of the certificate of deposit under specified conditions, but XYZ retained a residual interest in the certificate of deposit.

In November 1989, BNL stopped making payments to XYZ and filed a declaratory judgment action in federal court in Atlanta stating that it was no longer liable under the BNL letter of credit. XYZ counterclaimed asserting that BNL had breached the terms of the BNL letter of credit by refusing to honor XYZ's draws.[7] Because XYZ had assigned to First Phoenix an interest in the BNL letter of credit, First Phoenix filed a notice of

---

[7] After BNL refused to make payment on the letter of credit, XYZ and Machinery Trade arranged for XYZ to receive payments through the Iraqi embassy in Washington, D.C.. XYZ received over $3,000,000 through this embassy.

7

interest and moved to intervene in the action.

On August 2, 1990, Iraq invaded Kuwait. On that same day, Rafidain Bank made a pay or extend demand to Bank of America International in connection with the two Northern Trust letters of credit in favor of Machinery Trade; Bank of America International made a similar demand on Northern Trust. In August 1990, XYZ and First Phoenix filed suit in Houston, Texas to enjoin Bank of America International and Northern Trust from releasing funds to Rafidain Bank. XYZ and First Phoenix succeeded in obtaining a preliminary injunction preventing Rafidain from drawing against Bank of America International and Bank of America International from drawing on the Northern Trust letters of credit.

With the contract between Machinery Trade and XYZ at an impasse, XYZ was without a source of income and had difficulty meeting its financial obligations. Accordingly, TRU-MET was unable to make payments on the purchase of Carbitech's stock. The sellers of the Carbitech stock called on XYZ's guarantee and eventually filed suit in Indiana. In April 1992, the former Carbitech shareholders obtained a default judgment of approximately $1,700,000 against XYZ.

On January 4, 1993, XYZ filed a cross-claim against First Phoenix in the Houston litigation, alleging that the joint venture agreement was usurious, and claiming ownership of the certificate of deposit. First Phoenix, in defense, asserted that the money due under the joint venture agreement was a profit and not interest and, as a result, Texas usury law did not apply.

8

Largely in response to the cross-claim in Houston, First Phoenix filed suit in federal court in Phoenix, Arizona against XYZ seeking a declaratory judgment to have the court determine that the payments due under the joint agreement were not usurious but were in fact a joint venture profit. First Phoenix also sought a money judgment of $966,000 for this joint venture profit and expenses incurred by First Phoenix.

On July 21, 1993, the district court in the Atlanta litigation entered a Memorandum Opinion finding in favor of XYZ against BNL in an amount exceeding $2,000,000. XYZ filed a motion to amend the judgment to add pre-judgment interest. That motion remained pending for several months.

In November 1993, XYZ and the Spangler entities met to discuss settlement. Spangler wrote out an outline of a deal and faxed it to XYZ's attorney. This draft of the deal provided that the Spangler entities would receive $1,200,000, which would come out of the expected judgment against BNL in the Atlanta litigation. However, the parties met again a few days later. For reasons that are not adequately explained in the record evidence, the parties finally agreed to settle upon terms much more favorable to the Spangler entities.

In implementing the settlement agreement, the parties entered into a consent judgment in the Arizona litigation in favor of the Spangler entities and against XYZ. The judgment was in an amount of approximately $2,300,000, including interest.[8] The

---

[8]     In this opinion, we refer to this as the Arizona consent judgment.

amount of the Arizona consent judgment was virtually identical to the amount (net after attorneys' fees) which XYZ would receive from the judgment against BNL in the Atlanta litigation. Pursuant to the settlement, this $2,300,000 was transferred to the Spangler entities in satisfaction of the Arizona consent judgment. The subsequent implementation of the settlement agreement was somewhat different from the settlement agreement, and was extremely complicated, complex, and convoluted.

A fact finder could reasonably conclude from this summary judgment record that after full implementation of the settlement agreement, XYZ was left with virtually no assets, having given up the following assets: (a) the approximately $2,300,000 that it netted after attorneys' fees from the judgment against BNL in the Atlanta litigation; (b) XYZ's remaining interest in the $1,000,000 certificate of deposit; (c) real estate which it had owned, subject to a bank mortgage; and (d) a usury claim against the Spangler entities which it had been asserting in the Houston litigation and the Arizona litigation, both of which were settled as part of the settlement agreement.

Questions of fact surround the Arizona consent judgment entered into by the parties in favor of the Spangler entities in an amount of approximately $2,300,000. The fact finder could reasonably find that the full $2,300,000 did not in fact go to the Spangler entities, but rather that $550,000 went to either a corporation controlled by Muscarella's mother or to the benefit of Muscarella's business interests.[9] In addition, a fact finder

---

[9]    It is clear that the Spangler entities ended up with $1,500,000 in the Scott M. Spangler Charitable Remainder Unitrust. There are issues of fact with respect to part or all of

10

could reasonably find that the $1,000,000 certificate of deposit (subject to any lien of Northern Trust) also ended up in the possession of a corporation owned by Muscarella's mother.  The record does not adequately explain why Muscarella, or friends or family of Muscarella, were permitted to receive any of the assets.

## II.  ISSUES

We first address whether the district court sitting in bankruptcy can entertain the Trustee's challenge to the Arizona consent judgment.  This is a legal issue which we review de novo.

Next, we address the issues of actual and constructive fraud.  Under 11 U.S.C. § 548, there are two types of fraudulent transfer claims: actual fraud and constructive fraud.  We address each in turn, first the issue of actual fraud and then the issue of constructive fraud.  In the summary judgment posture of this case, summary judgment is appropriate when evidence in the summary judgment record gives rise to no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  We review the district court's grant of summary judgment de novo and apply the same standards as the district court.

---

another $250,000.  But what is significant for this opinion is that the fact finder might reasonably find that the Spangler entities ended up with at least $550,000 less than the full $2,300,000, and that this $550,000 was diverted to a corporation owned by Muscarella's mother or to persons or organizations benefitting Muscarella personally, to the exclusion of XYZ's creditors.  There is evidence that the $550,000 passed through Keating's possession, and that Keating retained approximately $10,000.

11

Finally, we address the district court's granting of Keating's motion for summary judgment.

## III. __DISCUSSION__

### A. THE ARIZONA CONSENT JUDGMENT

The primary transfer challenged by the Trustee's fraudulent transfer claim is the $2,300,000 which XYZ transferred to the Spangler entities in satisfaction of the Arizona consent judgment in federal court. The Spangler entities argue that this transfer is shielded by the Arizona consent judgment in favor of the Spangler entities and against XYZ. In other words, they argue that a bankruptcy court is powerless to look behind the Arizona consent judgment. The district court rejected this argument of the Spangler entities, as do we.

In Pepper v. Litton, 308 U.S. 295, 60 S. Ct. 238 (1939), the Supreme Court rejected a claim of res judicata and sustained the power of a bankruptcy court to look behind a previous state court judgment. Emphasizing the broad equitable powers of bankruptcy courts, the Court stated:

> [A] bankruptcy court has full power to inquire into the validity of any claim asserted against the estate and to disallow it if it is ascertained to be without lawful existence. And the mere fact that a claim has been reduced to judgment does not prevent such an inquiry. As the merger of a claim into a judgment does not change its nature so far as provability is concerned, so the court may look behind the judgment to determine the essential nature of the liability for purposes of proof and allowance. . . . And the bankruptcy trustee may collaterally attack a judgment offered as a claim against the estate for the purpose of showing that it was obtained by collusion of the

12

parties . . . .

Id. at 305-06, 60 S. Ct. at 244-45 (citations omitted).  In that case, Litton, the controlling

stockholder of the bankrupt corporation, caused the bankrupt to confess judgment in favor

of Litton, thus giving Litton a judgment lien against the bankrupt for amounts alleged to

have been for past unpaid salary.  Id. at 297, 60 S. Ct. at 240.  The bankruptcy court

found "a planned and fraudulent scheme," id. at 312, 60 S. Ct. at 248, and found that the

lien (or confessed judgment) and subsequent transfer of property to Litton pursuant

thereto were but steps "in a general fraudulent plan . . . designed to defeat creditors."  Id.

The effect of the Supreme Court's holding in Pepper v. Litton affirmed the power of the

bankruptcy court to look behind the consent judgment which Litton had caused his

corporation to confess in his own favor under the circumstances there, which included

"collusion of the parties."   Id. at 306, 60 S. Ct. at 245.[10]

---

[10]      In Pepper v. Litton, the consent judgment referred to in the text above was entered
into in state court before the bankruptcy, and the trustee in bankruptcy was obviously not a party.
The Court in Pepper v. Litton also focused on subsequent litigation, in which the trustee in
bankruptcy himself became a party in a subsequent phase of the state court litigation, i.e., when
the trustee in bankruptcy later moved in state court to set aside the Litton consent judgment.
Pepper, 308 U.S. at 299, 60 S. Ct. at 241.  Even though the trustee in bankruptcy had himself
attempted to set aside the Litton consent judgment in the state court, the Supreme Court rejected
the claim of res judicata.  However, that holding must be viewed in light of Heiser v. Woodruff,
327 U.S. 726, 66 S. Ct. 853 (1946), in which the Court held generally that res judicata applies in
bankruptcy proceedings.  In Heiser, the trustee in bankruptcy had himself been a party in the
previous litigation culminating in the previous judgment claimed to be res judicata.  In that
previous litigation to which the trustee in bankruptcy was a party, the claim of fraud was
presented by the trustee to set aside the prior judgment, id. at 730, 66 S. Ct. at 855, and was
"fully heard, and the contested issue . . . decided against him."  Id. at 733, 66 S. Ct. at 856.
Recognizing that the trustee in bankruptcy in Pepper v. Litton had also moved in state court to
set aside the Litton judgment, and that the Pepper v. Litton court had nevertheless rejected res
judicata, the Court in Heiser distinguished Pepper v. Litton, pointing out that in Pepper v. Litton
"the issue which the bankruptcy court later considered was not an issue in the trial of the cause

13

The Second Circuit, in Margolis v. Nazareth Fairgrounds & Farmers Mkt., 249 F.2d 221 (2d Cir. 1957), followed the foregoing rule of Pepper v. Litton and held that the broad equity powers of a bankruptcy court empowered it to look behind a previous judgment to determine the essential nature of the liability and to disregard such a judgment if obtained by collusion. Margolis, 249 F.2d at 223-24 (following and quoting from Pepper v. Litton). Under the circumstances of that case, which were similar to Pepper v. Litton, the Second Circuit rejected the res judicata defense. Id. at 224. See Coleman v. Alcock, 272 F.2d 618 (5th Cir. 1959)[11] (rejecting a res judicata defense to a fraudulent transfer claim of a trustee in bankruptcy and holding that the trustee was not bound by a previous state court judgment merely because the bankrupt was a party, thus implying that the trustee could challenge the previous judgment); see also Kelleran v. Andrijevic, 825 F.2d 692, 694 (2d Cir. 1987) (stating that "[b]ankruptcy courts may look beyond a state court default judgment where the judgment was procured by collusion or fraud"); In re Beck-Rumbaugh Assoc., Inc., 103 B.R. 628, 633-34 (Bankr. E.D. Pa. 1989)

---

in the state court and could not be adjudicated there." Heiser, 327 U.S. at 738-39 n.*, 66 S. Ct. at 858-59 n.*.

Thus, there were two holdings in Pepper v. Litton. The holding with respect to the subsequent state court litigation to which the trustee was a party has been clarified by Heiser, as explained in this footnote. On the other hand, nothing in Heiser undermines the Pepper v. Litton holding with respect to the original Litton consent judgment to which the trustee was not a party. This is the holding to which we refer in this opinion as the rule of Pepper v. Litton. Later in this opinion, we explain more fully why Heiser does not undermine this holding.

[11] In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981) (en banc), this court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981. Id. at 1209.

14

(finding that, in light of <u>Pepper v. Litton</u> and its progeny, the bankruptcy court could look behind a state court consent judgment that was entered into collusively so as to deprive another creditor of its lawful stake in the proceeds of the debtor); <u>In re Fill</u>, 82 B.R. 200, 217-18 (citing <u>Pepper v. Litton</u> and holding that the bankruptcy court was not precluded from setting aside the judgment because of <u>res judicata</u>, and further noting that the judgment was "collusive and laced with fraud") (Bankr. S.D.N.Y. 1987). The instant case fits comfortably within the rule of <u>Pepper v. Litton</u> and its progeny. As we discuss below in this opinion, there is ample evidence in this summary judgment record giving rise to genuine issues of fact with respect to whether the Arizona consent judgment was taken as part of a scheme of fraud and collusion not only on the part of XYZ and Muscarella, but also on the part of the Spangler entities. Following the rule of <u>Pepper v. Litton</u> and its progeny, we hold that the district court in this case, sitting in bankruptcy, properly entertained the Trustee's challenge to the Arizona consent judgment.[12]

Our holding in this regard is explained not only by the foregoing precedent, but also by the following reasoning. The Arizona consent judgment was not binding upon the Trustee. The Trustee represents the rights of the creditors of XYZ who were not parties to the Arizona consent judgment and whose interests were not represented by XYZ,

---

[12]    With respect to this issue, the parties have not argued that the law of any state should govern, and have cited only federal cases. Having litigated the issue as a matter of federal law and having presented no choice of law issue to this court, we accept the implied concession that federal law governs. We note also that the Arizona consent judgment was in a federal court.

which was a party to that judgment.[13]  With respect to the Arizona consent judgment, the Trustee was not in privity with XYZ.  See Fill, 82 B.R. at 217.  In circumstances somewhat similar to those in the instant case, the former Fifth Circuit in Coleman v. Alcock, supra, held that a trustee in bankruptcy is not bound, either by res judicata or collateral estoppel, by an in personam judgment in prior litigation in which the bankrupt was a party.  The court held:

> [W]e are of the view that the Trustee is not bound, either on res judicata or judicial collateral estoppel, by the prior state court proceedings.  The Trustee is, of course, a successor of the Bankrupt for many purposes.  But he is much more both in the extraordinary rights with which the Bankruptcy Act invests him, and as a general representative of the creditors.  Unless he intervenes and takes on the role of an active litigant subjecting himself thereby to the usual incidents of such action, he is not bound by the judgment merely because the Bankrupt was a party defendant in the prior litigation.

Coleman, 272 F.2d at 621-22 (footnote omitted).  The decision in Coleman does not elaborate on the circumstances under which the trustee in bankruptcy will be deemed not to be in privity with the debtor, and thus not bound by a prior judgment involving the debtor.  Nor need we elaborate in the instant case beyond the circumstances here.  As will be demonstrated in the discussion below, the fact finder in the instant case could reasonably find that the Arizona consent judgment was part of a collusive scheme on the part of XYZ and the Spangler entities to hinder, delay, or defraud creditors.  Thus, we

---

[13]     Indeed, as discussed below, the summary judgment evidence creates a genuine issue of fact with respect to whether XYZ was intending to hinder, delay, or defraud the very creditors that the Trustee represents.

16

need hold in the instant case, and we do hold, only that the Trustee in bankruptcy would not be in privity with XYZ, with respect to the Arizona consent judgment, where that judgment was obtained as part of a collusive scheme on the part of XYZ and the Spangler entities to hinder, delay, or defraud creditors.

This holding is consistent with Heiser v. Woodruff, 327 U.S. 726, 66 S.Ct. 853 (1946), in which the Supreme Court clarified its prior decision in Pepper v. Litton. After holding generally that res judicata is applicable in bankruptcy proceedings, the Court discussed Pepper v. Litton and said:

> Undoubtedly, since the bankruptcy act authorizes a proof of claim based on a judgment, such a proof may be assailed in the bankruptcy court on the ground that the purported judgment is not a judgment because of want of jurisdiction of the court which rendered it over the persons of the parties or the subject matter of the suit or because it was procured by fraud of a party. Pepper v. Litton, supra, 308 U.S. 306, 60 S.Ct. 245, 84 L.Ed. 281; Chandler v. Thompson, 7 Cir., 120 F. 940; In re Continental Engine Co., 7 Cir., 234 F. 58; In re Stucky Trucking & Rigging Co., D.C., 243 F. 287; In re Rubin, 7 Cir., 24 F.2d 289.

327 U.S. at 736, 66 S. Ct. at 857-58. Thus, Heiser recognized and reaffirmed the rule of Pepper v. Litton, as described earlier in this opinion[14] – that res judicata does not preclude a bankruptcy court from looking behind even a claim which has been reduced to a judgment against the bankrupt where "the purported judgment is not a judgment . . . because it was procured by fraud...." Heiser, 327 U.S. at 736, 66 S. Ct. at 858. Where a prior judgment against the bankrupt was procured as part of a collusive scheme to hinder,

---

[14] See supra n.10.

17

delay, or defraud creditors, as in <u>Pepper v. Litton</u> and as the fact finder might find in the

instant case, <u>res judicata</u> does not preclude inquiry by the bankruptcy court. This reading

of <u>Heiser</u> is reinforced by the other cases which <u>Heiser</u> cites for this proposition. For

example, in <u>Chandler v. Thompson</u>, 120 F. 940 (7th Cir. 1902), the court rejected a claim

of <u>res judicata</u> under circumstances indistinguishable from the instant case. There,

appellee had obtained a consent judgment against the bankrupt before the bankruptcy.

After bankruptcy, appellee filed a claim against the bankrupt estate based on the consent

judgment. Another judgment creditor and the trustee in bankruptcy objected to appellee's

claim; in defense, appellee argued that <u>res judicata</u> precluded the bankruptcy court from

impeaching the prior consent judgment. In rejecting appellee's argument, the Seventh

Circuit held:

> The averments, in the petition, of fraud and collusion are inartistically
> drawn. They show in substance, however, that no real debt underlay the
> judgments, but that the judgments were entered in pursuance of a scheme
> (to which both judgment creditor and judgment debtor were parties) to
> hinder, delay, and defraud certain claimants, in the collection of claims
> pending against [the bankrupt].
>
> The case, thus presented, is not that of an attack collaterally upon the
> judgments by the parties thereto, or their privies. It is the case of an attack
> by the trustee of third persons, strangers to the judgment, whose rights and
> interests would be injuriously affected, if the judgments were allowed to
> stand proved as claims. As to such persons, a judgment procured through
> the collusion of the parties thereto, and founded upon no real debt, is to be
> treated as void, and open to collateral attack . . . .

<u>Chandler</u>, 120 F. at 941. To the same effect, <u>see</u> <u>In re Continental Engine Co.</u>, 234 F. 58

(7th Cir. 1916); <u>In re Stucky Trucking & Rigging Co.</u>, 243 F. 287 (D.C.N.J. 1917).[15]

Thus, we conclude that <u>Heiser</u> reaffirms the rule of <u>Pepper v. Litton</u> as described above in this opinion. We also conclude that the instant case fits comfortably within the rule of <u>Pepper v. Litton</u> and its progeny. Moreover, the rule of <u>Pepper v. Litton</u> and its application in this case comports with sound common sense. We see no reason why one creditor of a bankrupt should be able to escape the usual scrutiny with respect to fraudulent transfers merely because that creditor's claim was reduced to a judgment prior to the bankruptcy, where the trustee in bankruptcy was not a party and its interests were not represented, but rather where the prior judgment was obtained by parties antagonistic to the trustee's interests as part of a collusive scheme to hinder, delay, or defraud other

---

[15] Although some subsequent cases have narrowly construed the passage in <u>Heiser</u> which acknowledges that bankruptcy courts have the power to look behind a previous judgment where the judgment was procured by fraud, none of those cases have involved a prior judgment obtained as part of a collusive scheme to hinder, delay, or defraud creditors. Because the very cases cited by <u>Heiser</u> – <u>Pepper v. Litton</u>, <u>Chandler v. Thompson</u>, <u>In re Continental Engine Co.</u>, and <u>In re Stucky Trucking & Rigging Co.</u> – affirmed the authority of a bankruptcy court to look behind a prior judgment obtained as part of a collusive scheme to hinder, delay, or defraud creditors, we are confident that the fraudulently procured judgment contemplated by <u>Heiser</u> includes fraud of such nature, and therefore includes the fraud in the instant case. Moreover, the fraud in the instant case fits comfortably within the description of the necessary fraud in one of the leading cases amongst the progeny of <u>Heiser</u>. In <u>Browning v. Navarro</u>, 826 F.2d 335 (5th Cir. 1987), the Fifth Circuit discussed <u>Heiser</u> and the circumstances which would warrant disregarding <u>res judicata</u>. The court stated:

> [The party challenging the prior judgment] must demonstrate that the judgment was obtained as the result of a scheme or collusion that is designed to influence corruptly the proceedings, or to inhibit the ability of an adverse party to fully present his case or defense, and which has the effect of foreclosing to him the opportunity to have a fair and complete trial.

<u>Browning</u>, 826 F.2d at 345. Where a prior consent judgment was obtained as part of a collusive scheme to hinder, delay, or defraud other creditors, as the fact finder might reasonably find on remand in the instant case, the fraud falls comfortably within the Fifth Circuit's description.

creditors. For the foregoing reasons, we conclude that both precedent and reason support our conclusion rejecting the res judicata argument of the Spangler entities based upon the Arizona consent judgment. On remand, the district court can properly look behind that judgment upon the appropriate showing of fraud and collusion.

B. ACTUAL FRAUD

We turn next to the issue of actual fraud. The district court held that the Trustee had failed to create a genuine issue of material fact, and granted summary judgment in favor of the Spangler entities. The Trustee asserts that the district court did not apply the proper "badges of fraud" analysis. Because proof of "actual intent to hinder, delay, or defraud" creditors, pursuant to 11 U.S.C. § 548, may rarely be accomplished by direct proof, the Trustee argues that courts may infer fraudulent conduct from the circumstantial evidence and the surrounding circumstances of the transactions. We agree with the Trustee. In determining whether the circumstantial evidence supports an inference of fraudulent intent, courts should look to the existence of certain badges of fraud.[16] See In

---

[16] Both parties acknowledge that courts should look to the badges of fraud in analyzing actual fraud pursuant to § 548(a)(1). The Spangler entities contend, however, that this court does not have to reach a badges of fraud inquiry. The Spangler entities argue that a legitimate business purpose successfully rebuts any showing of actual fraud. See In re Sherman, 67 F.3d 1348, 1354 (8th Cir. 1995) (stating that badges of fraud are sufficient to establish actual fraudulent intent, "absent significantly clear evidence of a legitimate supervening purpose."). The basis for this assertion centers on the legitimacy of First Phoenix's claim to the BNL letter of credit. The Spangler entities contend that it was a reasonable business decision for XYZ to turn the entire proceeds from the Atlanta litigation over to First Phoenix because XYZ had no hope of dealing with its other creditors while First Phoenix stood waiting at its front door. However, in light of the circumstances of this case, we conclude that the Spanglers have not shown evidence of a legitimate business purpose sufficient to overcome the reasonable inferences of fraud. In addition to the inferences of fraud discussed below, at the time of the

20

re Sherman, 67 F.3d 1348, 1353-54 (8th Cir. 1995); In re Acequia, Inc., 34 F.3d 800, 805-06 (9th Cir. 1994); FDIC v. Anchor Properties, 13 F.3d 27, 32 (1st Cir. 1994); In re Brantz, 106 B.R. 62, 67 (Bankr. E.D. Pa. 1989). In Sherman, the court stated that fraudulent conduct may be inferred from the circumstances following a transfer. Sherman, 67 F.3d at 1353. In determining whether the circumstantial evidence is sufficient to establish fraudulent intent, the court should investigate the transfer for the existence of badges of fraud.[17] These badges of fraud include:

(1) The transfer was to an insider;
(2) The debtor retained possession or control of the property transferred after the transfer;
(3) The transfer was disclosed or concealed;
(4) Before the transfer was made the debtor had been sued or threatened with suit;
(5) The transfer was of substantially all the debtor's assets;
(6) The debtor absconded;
(7) The debtor removed or concealed assets;
(8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred;
(9) The debtor was insolvent or became insolvent shortly after the transfer was made;
(10) The transfer occurred shortly before or shortly after a substantial debt was incurred; and

---

settlement negotiations, the Spanglers' security interest was not perfected because XYZ had retained possession of the BNL letter of credit. See infra n.20. Thus, the validity and priority of the Spangler security interest was vulnerable. As we will discuss in greater detail, the structure of the settlement agreement left XYZ with almost no assets. Furthermore, assets originally slotted for creditors were funneled off for other uses.

[17] Although the presence of one specific "badge" will not be sufficient to establish fraudulent intent, the "confluence of several can constitute conclusive evidence of an actual intent to defraud." Sherman, 67 F.3d at 1354 (quoting Max Sugarman Funeral Home, Inc. v. A.D.B. Investors, 926 F.2d 1248, 1254 (1st Cir. 1991)); see also In re Kranich, 53 B.R. 821 (Bankr. M.D. Fla. 1985).

(11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Alabama Code, § 8-9A-4(b)(Supp. 1996); see also Arizona Revised Statutes, § 44-1004(b)(1990).[18]

After a careful review of the briefs and the summary judgment record, and after oral argument, we readily conclude that the evidence adduced creates genuine issues of material fact as to whether or not there was an actual intent to hinder, delay, or defraud creditors. We find genuine issues of fact with respect to actual fraud on the part of XYZ and its principal, Muscarella, and also on the part of the Spangler entities.

In this opinion, we focus on the transfer of the approximately $2,300,000 (proceeds from the BNL letter of credit, which the Atlanta judgment awarded to XYZ) by XYZ to the Spangler entities. Our focus is on the initial $2,300,000 transfer[19] to the

---

[18] The parties acknowledge that the appropriate analysis of actual fraudulent intent under § 548(a) would look to the badges of fraud. The parties also assume the applicability of the badges of fraud itemized in the text, which are substantially the same under the laws of Alabama and Arizona. Thus, this appeal presents no choice of law issues.

[19] There is evidence that virtually all of the assets of XYZ were dissipated as a result of the settlement agreement between Muscarella, as owner of XYZ, and the Spangler entities. Thus, other assets that a fact finder might deem to have been transferred, in addition to the $2,300,000 include:

(a) XYZ's potential interest in the $1,000,000 certification of deposit, to the extent of the excess of same over any potential liability to Northern Trust. This certificate of deposit was lost to XYZ as a result of the implementation of the settlement agreement;

(b) Real estate which XYZ had at one time owned, subject to a bank mortgage; and

(c) The usury claims which XYZ was asserting against the Spangler entities both in the Houston litigation and in the Arizona litigation. The Trustee asserts that a fact finder could find that the usury claim had the potential of eliminating or reducing substantially the value of any

22

Spangler entities in satisfaction of the Arizona consent judgment, and on the subsequent flow of this money pursuant to the implementation of the settlement agreement.

We turn our attention first to the evidence suggesting that Muscarella and the Spangler entities fixed the amount of the Arizona consent judgment in favor of the Spangler entities at approximately $2,300,000, notwithstanding the fact that all parties intended at the time that the Spangler entities would actually receive a substantially lesser sum, with the balance thereof to be diverted primarily to Muscarella personally or to persons or family designated by him. Evidence to the foregoing effect includes: (a) the affidavit filed by the Spangler entities in the Atlanta litigation indicating that the Spangler entities were owed approximately $1,250,000, approximately 6 months before the Arizona consent judgment; (b) a draft of the settlement agreement, reflecting the status of the settlement negotiations just a few days before the final settlement agreement was reached, indicating that the Spangler entities were owed $1,200,000, and the testimony of Muscarella that during the negotiations leading up to the Arizona consent judgment the Spangler entities only claimed they were owed $1,250,000; (c) the testimony of Muscarella that the Arizona consent judgment was intended to be in the precise amount of the Atlanta judgment, despite the fact that Muscarella did not know whether XYZ owed the Spangler entities anything close to $2,000,000 at the time; and (d) most importantly,

---

claim the Spangler entities had against XYZ. The usury claim was abandoned as part of the settlement agreement which dismissed the Houston litigation, and finalized the Arizona litigation with the Arizona consent judgment.

in the actual disbursement of the monies as part of the implementation of the settlement agreement, the fact that the Spangler entities actually ended up with substantially less than the $2,300,000 amount of the consent judgment, with approximately $550,000 (plus the $1,000,000 certificate of deposit) being diverted either to Muscarella personally or to persons or family designated by him. Based on the foregoing evidence, the fact finder could reasonably find that Muscarella, in control of XYZ, and the Spangler entities artificially inflated the amount of the Arizona consent judgment, notwithstanding the intent on the part of all parties that the Spangler entities would actually end up with a substantially lesser amount and that $550,000 would be diverted to either a corporation owned by Muscarella's mother or to persons or organizations benefitting Muscarella's business interests, to the exclusion of XYZ's creditors.

We also conclude that there is evidence from which a fact finder could reasonably find that the above-mentioned artificial inflation of the amount of the Arizona consent judgment was intended by Muscarella and the Spangler entities as part of a collusive scheme to hinder, delay, or defraud the creditors of XYZ. The following evidence would support such a finding:

(a) Shortly before the finalization of the settlement agreement, Birenbaum, one of the attorneys for the Spangler entities, wrote a letter to Scott Spangler noting that Spangler had told the attorneys that one of the arguments that Muscarella intended to use in negotiating with his creditors was that the Spangler entities had a first-priority security interest in the proceeds of the BNL letter of credit, and, consequently, that the other

24

creditors of XYZ could ultimately receive little or nothing even after the Atlanta litigation was resolved. The letter also noted Muscarella's request that the settlement agreement be structured so as to ensure the priority security interest of the Spangler entities. The letter also noted that the Spangler entities were certainly taking the position that they had a first-priority security interest in the BNL letter of credit, but acknowledged that it did not appear that the Spangler entities would be entitled to all of the proceeds, then estimated to be approximately $2,100,000, thus possibly leaving a significant portion for the other creditors. Finally, the letter noted the possibility that the security interest of the Spangler entities might be successfully attacked. With regard to the latter, the evidence in this record indicates that possession of the BNL letter of credit was not delivered to the Spangler entities until late November 1993, shortly after the date of the Birenbaum letter. During the settlement negotiations, the fact that the Spangler entities did not have possession of the letter of credit was known to both sides, and both sides thus were aware of the legal vulnerability of the Spangler security interest.[20]

(b) Muscarella testified in his deposition that he needed to have the Spangler lien remain in place so that he could use it as leverage in negotiating with other XYZ creditors. He had advised Spangler of this.

(c) Muscarella's attorney, Chamberlin, testified in deposition that he had discussed

---

[20]   In the companion case, No. 96-7035, this court has held that the Spanglers' security interest in the BNL letter of credit first became perfected in late November 1993, on the date the Spangler entities took possession of the BNL letter of credit. The opinion in No. 96-7035 is being published simultaneously with this opinion.

with Muscarella the need to make sure that the Spangler entities had a lien on the BNL letter of credit proceeds before settlement negotiations.

(d) Shortly after the foregoing, XYZ, in November 1993, delivered possession of the BNL letter of credit to the Spangler entities, thus perfecting the security interest of the Spangler entities.

(e) If the fact finder concludes that the Arizona consent judgment was in fact artificially inflated, that in itself would add support for a finding of intent on the part of Muscarella, XYZ, and the Spangler entities to hinder, delay, or defraud creditors, at least in the absence of other credible explanation. In other words, the most reasonable explanation for artificially inflating the amount of the judgment may be an intent to use the judgment as a shield to make assets unavailable to other creditors of XYZ.

(f) Finally, the fact finder could reasonably find that, of the $2,300,000 initially transferred to the Spangler entities, at least $550,000 was ultimately diverted to Muscarella's mother's corporation or otherwise for Muscarella's benefit. The fact finder could reasonably find that this diversion, and also the transfer of the $1,000,000 certificate of deposit which ended up in Muscarella's mother's corporation, occurred with the knowledge and participation, not only of Muscarella, but also of the Spangler entities.

On the basis of all the evidence, the fact finder could reasonably find that the Arizona consent judgment was artificially inflated with the intent on the part of the parties to use the judgment as a shield against creditors to protect the diversion of funds to Muscarella, or persons or family influenced by him.

26

Looking at the foregoing evidence through the prism of the badges of fraud, we readily conclude that a reasonable trier of fact could find that most of the badges of fraud are established by the evidence in the summary judgment record. We turn first to discuss the eighth badge of fraud, i.e., the issue of whether or not the value of the consideration received by the debtor, XYZ, was reasonably equivalent to the value of the assets transferred. The primary asset transferred by XYZ was the approximately $2,300,000 representing the proceeds of the BNL letter of credit which were awarded to XYZ by the district court in Atlanta.[21] The primary value received by XYZ was the satisfaction of the consent judgment in the Arizona litigation.[22] The Spangler entities argue that their claims, which were thus settled, greatly exceeded the $2,300,000 received, and thus amounted to equivalent value. We readily conclude that a reasonable fact finder might find otherwise.[23] Thus, we conclude that the fact finder could reasonably find the

---

[21] See supra n.19 (listing other assets that a reasonable fact finder may find were transferred by XYZ as a result of the settlement agreement and ensuing transactions).

[22] Also settled were any claims by the Spangler entities against XYZ in the Atlanta litigation and the Houston litigation.

[23] As is often the case when genuine issues of material fact preclude summary judgment, it is true that the Spangler entities have adduced evidence from which a jury might find equivalent value. However, they have not persuaded us that they had claims equaling or exceeding a realistically perceived value of $2,300,000, thus eliminating genuine issues of fact in this regard. This is especially true in light of the ample evidence suggesting that the Spangler entities never intended to receive the full $2,300,000. Moreover, there are genuine issues of material fact as to the realistic value of several of the Spangler claims. For example, there is very little evidence that the Spangler entities realistically perceived that they had a viable claim for $875,531 for any remaining liability on the Northern Trust letters of credit. The evidence suggests that those letters of credit were amply collateralized by the $1,000,000 certificate of deposit.

27

existence of the eighth badge of fraud.

There is ample evidence from which a reasonable fact finder could find that the transfers in connection with the implementation of the settlement agreement transferred substantially all of the debtor's assets, and left the debtor insolvent, thus satisfying the fifth and ninth badge of fraud. With respect to the fourth badge of fraud, it might reasonably be found that the debtor, XYZ, was subject to judgments and threatened suits by creditors immediately before the transfer.

A reasonable fact finder could also find that the first, second, seventh, and eleventh badges of fraud are satisfied. All deal with retention of possession or control by the debtor or insiders. There is ample evidence from which it could reasonably be found that essential assets of the debtor, XYZ, were transferred to a lienor, the Spangler entities, who then transferred assets to an insider. For example, the fact finder could reasonably find that $550,000, plus XYZ's residual interest in the $1,000,000 certificate of deposit, ended up in the hands of insider Muscarella, or persons or family controlled by him.

Finally, there are reasonable inferences in this summary judgment record from which it might reasonably be found that the third badge of fraud is satisfied, namely, that the transfer was concealed. The fact finder might reasonably infer, from the fact that the implementation of the settlement agreement was delayed approximately 90 days, that there was an intent to conceal the transfer for a sufficient length of time until the bankruptcy preference period expired. Moreover, an intent to conceal might reasonably be inferred from the complex and convoluted nature of the transfers by which the

28

settlement agreement was implemented. While it is true that mere complexity would not give rise to an inference of fraud or intent to conceal, in this case, the record wholly fails to provide any reasonable explanation for a considerable number of the convoluted transactions involved.

After careful consideration of the evidence discussed above in light of the badges of fraud, we readily conclude that there is ample evidence from which a fact finder could reasonably find an actual intent on the part of both the debtor, XYZ, and the Spangler entities to hinder, delay, or defraud creditors.[24] The district court's contrary conclusion

---

[24] It is true that there is also evidence in the record on the basis of which a fact finder could find that the Spangler entities were innocent dupes with respect to the fraud on creditors. There is evidence that the plan for settlement originally contemplated that the $550,000 (which ultimately found its way into the pockets of Muscarella personally or persons or family designated by him) would ultimately benefit creditors of XYZ. The plan apparently contemplated that XYZ could use the $550,000 to fund a new letter of credit to be substituted for the two Northern Trust letters of credit, which in turn would free up for XYZ's use the $1,000,000 certificate of deposit which had collateralized the two Northern Trust letters of credit. There is some evidence that this original plan was intended to make available to XYZ that $1,000,000 for the benefit of XYZ's other creditors. While a fact finder might find the Spangler entities innocent on the basis of the foregoing evidence, several reasons persuade us that there remain genuine issues of fact with respect to the innocence of the Spangler entities. The foregoing original plan was not followed in the implementation of the settlement agreement. The $550,000 did not end up at the disposal of XYZ, nor did the $1,000,000 certificate of deposit. To the contrary, the $550,000 and the $1,000,000 certificate of deposit ended up in possession of a corporation owned by Muscarella's mother. Although the record does not explain how or why Muscarella's mother's corporation was permitted to swoop in and pocket such substantial assets, nevertheless this is what happened. There is evidence on the basis of which a fact finder could reasonably find that this occurred with the knowledge and participation not only of Muscarella, but also of the Spangler entities. Moreover, there is no adequate explanation in the record for the fact that the Arizona consent judgment may have been artificially inflated, thus leaving the reasonable inference that there was an intent on the part of Muscarella, XYZ, and the Spangler entities to use the consent judgment as a shield against other creditors. Thus, genuine issues of material fact remain with respect to actual fraud on the part of Muscarella, XYZ, and the Spangler entities.

29

was error.

C. CONSTRUCTIVE FRAUD

In addition to actual fraud, the Trustee also argues that the transfer of the $2,300,000 BNL proceeds to the Spangler entities was constructively fraudulent, pursuant to 11 U.S.C. § 548(a). The elements of a claim of constructive fraud under § 548(a) are that: (1) the debtor had an interest in property; (2) the transfer of that interest occurred within one year of the bankruptcy petition; (3) the debtor was insolvent at the time of the transfer or became insolvent as a result thereof; and (4) the debtor received less than reasonably equivalent value in exchange for such transfer. Finding that the Spangler entities did not deny any of the first three elements, the district court addressed only the issue of reasonably equivalent value. The district court rejected the Trustee's argument and determined that no genuine issue of fact existed as to whether or not XYZ had received reasonably equivalent value in exchange for the transfer of the BNL judgment proceeds to First Phoenix.

In our above discussion of the badges of fraud, we have already determined that there are genuine issues of material fact on the issue of reasonably equivalent value. We need not discuss the issue again. The fact finder could reasonably find all four elements of constructive fraud. The district court's contrary conclusion was error.

D. KEATING'S MOTION FOR SUMMARY JUDGMENT

The district court granted Keating's motion for summary judgment and dismissed the action as against Keating. The district court had already granted summary judgment

in favor of the Spangler entities, holding that they had given equivalent value for XYZ's transfer of the $2,300,000 BNL proceeds. The Trustee's claim against Keating was based on the allegation that Keating was at least a temporary recipient of a portion of the $2,300,000, pursuant to one of the convoluted transactions which followed XYZ's initial transfer of the $2,300,000 to the Spangler entities. In granting summary judgment in favor of Keating, the district court reasoned as follows: because the court had already ruled that XYZ had no further interest in the $2,300,000, it followed that neither XYZ nor its Trustee in bankruptcy had any interest in the subsequent transfers to other entities.

Our holding today, reversing the district court's grant of summary judgment in favor of the Spangler entities, nullifies the reasoning of the district court in its ruling in favor of Keating. Accordingly, we also reverse the district court's grant of summary judgment in favor of Keating.[25]

## IV. CONCLUSION

For the foregoing reasons, we reject the argument of the Spangler entities that the Trustee's challenge to the $2,300,000 is shielded by the Arizona consent judgment, and we conclude that there are genuine issues of material fact with respect to actual fraud and constructive fraud. We reverse the district court's grant of summary judgment in favor of

---

[25] Anticipating a possible reversal of the district court's grant of summary judgment in favor of the Spangler entities, Keating makes alternative arguments in support of the judgment in his favor. We decline to address the alternative arguments, preferring that they be addressed in the first instance by the district court.

the Spangler entities, and we reverse the district court's grant of summary judgment in favor of Keating. We remand this case for further proceedings not inconsistent with this opinion.

REVERSED AND REMANDED.